USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 14, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                        :
TRODALE HOLDINGS LLC,                                   :
                                                        :
                              Plaintiff,                :
                                                        :
              v.                                        :   16 Civ. 4254 (KPF)
                                                        :
BRISTOL HEALTHCARE INVESTORS L.P.;                      :   OPINION AND ORDER
LYNCHBURG HEALTHCARE INVESTORS,                         :
L.P.; DEMQUARTER HEALTHCARE                             :
INVESTORS, L.P.; SALEM NURSING &                        :
REHABILITATION CENTER OF REFORM,                        :
INC.; DOUGLAS K. MITTLEIDER.                            :
                                                        :
                              Defendants.               :
                                                        :
------------------------------------------------------- X

KATHERINE POLK FAILLA, District Judge[1]:

This Opinion is the Court's second to address claims arising from an Asset Purchase Agreement ("APA") entered into on February 6, 2014, between Plaintiff Trodale Holdings LLC ("Plaintiff" or "Purchaser") and Defendants Bristol Healthcare Investors, L.P.; Lynchburg Healthcare Investors, L.P.; DemQuarter Healthcare Investors, L.P.; and Salem Nursing & Rehabilitation Center of Reform, Inc. (together, the "Sellers"). Execution of the APA triggered a due diligence period, after which Plaintiff could either back out of the deal or move forward to buy four nursing homes from Sellers for a total of $30,600,000. Douglas K. Mittleider (together with the Sellers, "Defendants") is

---

[1] Fangyuan (Sophia) Song, a rising second-year student at the Benjamin N. Cardozo School of Law and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

alleged to be the owner — through a constellation of corporate entities — of the nursing homes to be sold under the APA.

For reasons detailed previously in the Court's November 29, 2017 Opinion and Order, the deal contemplated by the APA ultimately fell apart. *See Trodale Holdings LLC* v. *Bristol Healthcare Investors, L.P.*, No. 16 Civ. 4254 (KPF), 2017 WL 5905574, at *2-3 (S.D.N.Y. Nov. 29, 2017) ("*Trodale I*"). Plaintiff tendered a Notice of Default under the APA on April 21, 2016, and this action followed a few weeks later. After the Court granted in part and denied in part denied Defendants' motion to dismiss in *Trodale I*, Defendants filed an Answer that included counterclaims for breach of contract and fraud. Plaintiff now moves to dismiss Defendants' fraud claim; for the reasons that follow, the Court grants the motion.

## BACKGROUND[2]

### A. Factual Background

The APA provided that Plaintiff would purchase the assets and underlying real estate associated with four nursing homes: (i) The Cambridge House in Bristol, Tennessee; (ii) The Carrington in Lynchburg, Virginia; (iii) The Stratford House in Chattanooga, Tennessee; and (iv) Reform Nursing and

---

[2]    The Court draws its facts from the Second Amended Complaint (Dkt. #58 ("SAC")) and Defendants' Answer, Affirmative Defenses and Counterclaims (Dkt. #81 ("Countercl.")). For ease of reference, the Court refers to Plaintiff's moving brief (Dkt. #89), as "Pl. Br."; to Defendants' opposition (Dkt. #90), as "Def. Opp."; and to Plaintiff's reply brief (Dkt. #93), as "Pl. Reply." Because the APA forms the basis of Plaintiff's claims, is appended to the SAC as an exhibit, and is integral to Defendants' counterclaims, the Court will consider it in resolving Defendants' motion. *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." (internal quotation marks and alteration omitted)).

Rehab in Reform, Alabama (together the "Purchased Assets").  (SAC ¶¶ 29-30).  Paragraph 4(a) of the APA provided that Plaintiff would have 75 days (the "Due Diligence Period") to investigate the operation and financial condition of the Purchased Assets.  (Countercl. ¶¶ 7-8).  During the Due Diligence Period, Plaintiff had the right, "at reasonable times and on reasonable prior notice to Seller, to enter upon the Property to conduct [ ] inspections, investigations, tests and studies as [Plaintiff] shall reasonably deem[s] necessary, including … environmental site assessments, … physical examinations of the Property,[3] due diligence investigations and feasibility studies."  (APA ¶ 4(a)).  Plaintiff also had the right to tour the nursing homes, to review "books and records related to the financial condition and the operations" of the nursing homes, and "to observe the day-to-day operations and management" of the nursing homes.  (*Id.*).

If after completing its due diligence, "Purchaser shall not be so satisfied[,]" and if "Purchaser notifies Seller thereof in writing on or prior to the end of the Due Diligence Period, [the APA] shall be null and void and the Title Company shall refund the Deposit plus any accrued interest to [Plaintiff]."  (APA ¶ 4(a)).  But, "[i]f [Plaintiff] fails to give such notice to Seller upon or prior to the expiration of the Due Diligence Period, it shall be conclusively presumed that [Plaintiff] is satisfied with its due diligence review and this contingency shall be deemed satisfied, [the APA] shall continue in full force and effect."  (*Id.*).

---

[3]  "Property" is defined in the APA to include the land, buildings, personal property and fixtures.

The Due Diligence Period was initially set to expire on April 22, 2014 — 75 days after the APA was signed. (Countercl. ¶ 8). At Plaintiff's request, the Due Diligence Period was extended numerous times, concluding on April 12, 2016. (*Id.* at ¶¶ 15, 17).[4] Defendant alleges that Plaintiff did indeed conduct due diligence. (*Id.* at ¶ 10). For example, Plaintiff "install[ed] a representative at ... The Cambridge House, who was involved in leadership and daily operations for approximately five [ ] months[.]" (*Id.* at ¶ 11).

Defendants allege that after the Due Diligence Period finally expired, Plaintiff "did not close on the transactions[,]" "did not issue a Notice of Default ... within the extended time[,]" "did not indicate [timely] that there were any unsatisfied conditions to closing the contemplated transactions[,]" and "failed to deliver ... the purchase price as required by the APA." (Countercl. ¶¶ 20-24). These facts form the basis of Defendants' breach of contract claim. Defendants believe they are entitled to keep the earnest money deposits that remain in escrow as damages. (*Id.* at ¶¶ 26-29).

Separately, Defendants bring a fraud claim. They allege that "[w]ith each request for an extension of the Due Diligence Period," Berel Karniol, Plaintiff's sole member, represented that Plaintiff: (i) "was satisfied with the information it received from Sellers and about the subject skilled nursing home facilities"; (ii) "had a genuine interest in the Purchased Assets and the wherewithal to complete the transactions"; (iii) "was making good faith efforts to secure

---

[4] Plaintiff's pleadings indicate that it thought the extension was until April 21, 2016. (SAC ¶ 116).

4

appropriate financing and lease arrangements"; and (iv) "but needed the additional time to complete the arrangements for its financing or ... lease[.]" (Countercl. ¶¶ 31-32). Defendants allege that these representations regarding Plaintiff's "present intentions, and wherewithal and efforts were material" and "false," and that "Karniol knew they were false[.]" (*Id.* at ¶¶ 33-34). Defendants further allege that they were damaged by Karniol's representations because the Purchased Assets were tied up by Plaintiff from February 2014, until the termination of the APA in April 2016; Defendants assert that these damages go "beyond the extent of and [are] not contemplated by the liquidated damages provision." (*Id.* at ¶ 36).

## B.    Procedural Background

Plaintiff filed the SAC on January 27, 2017. (Dkt. #58). The parties appeared for a pre-motion conference with the Court on February 2, 2017, and Defendants filed a motion to dismiss on March 10, 2017. (Dkt. #73). On November 29, 2017, the Court granted in part and denied in part Defendants' motion to dismiss. (Dkt. #79). Defendants answered the SAC on December 15, 2017, and denied the Plaintiff's allegations. (Dkt. #81). In the Answer, Defendants brought counterclaims against Plaintiff for breach of contract and fraud. On January 24, 2018, Plaintiff filed the instant motion to dismiss Defendants' fraud claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. #85, 88-89). On February 20, 2018, Defendants filed their memorandum of law in opposition (Dkt. #90), and on March 9, 2018, briefing concluded when Plaintiff filed its reply brief. (Dkt. #93).

## DISCUSSION

**A.    Applicable Law**

    **1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) is subject to the same standard as a motion to dismiss a complaint. *Lokai Holdings LLC* v. *Twin Tiger USA LLC*, No. 15 Civ. 9363 (ALC), — F. Supp. 3d —, 2018 WL 739435, at *2 (S.D.N.Y. Feb. 6, 2018) (quoting *Orientview Techs. LLC* v. *Seven for All Mankind, LLC,* No. 13 Civ. 538 (PAE), 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)). When reviewing the sufficiency of counterclaims, the Court is required to "draw all reasonable inferences in [the non-moving party's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a motion to dismiss, a [counterclaim] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"Where a [counterclaim] pleads facts that are merely consistent with [the moving party's] liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557). Of importance here, "the

tenet that a court must accept as true all of the allegations contained in a [counterclaim] is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

### 2. Pleading Fraud Claims Under Federal Rule of Civil Procedure 9(b)

State-law fraud claims brought in a diversity action must be pleaded with particularity pursuant to Rule 9(b). *Premium Mortg. Corp.* v. *Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009). Specifically, "the [claim] must: [i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks and citation omitted). Additionally, to satisfy Rule 9(b), a claim must "allege facts that give rise to a strong inference of fraudulent intent." *Berman* v. *Morgan Keenan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (summary order) (internal quotation marks omitted) (quoting *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). "The requisite 'strong inference' of fraud may be established either [i] by alleging facts to show that defendants had both motive and opportunity to commit fraud, or [ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner,* 459 F.3d at 290-91 (internal quotation marks and citations omitted). The pleading standard under Rule 9(b) "serves to 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant

7

against the institution of a strike suit.'" *Rombach* v. *Chang,* 355 F.3d 164, 171 (2d Cir. 2004) (quoting *O'Brien* v. *Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir. 1991)).

**B. Analysis**

    **1. Defendants' Fraud Claim Is Not Duplicative of Their Breach of Contract Claim**

The gravamen of Defendants' counterclaim for fraud is that Plaintiff's representations regarding its intention to consummate the transactions proposed under the APA induced Defendants to consent to numerous amendments to the APA in reliance on those representations. This claim is, more precisely, one for fraudulent inducement insofar as Defendants allege that Plaintiff misrepresented its then-present intention to close the deal in order to prompt Defendants to agree to extensions of the Due Diligence period. *See Merrill Lynch & Co. Inc.* v. *Allegheny Energy, Inc.,* 500 F.3d 171, 184 (2d Cir. 2007) ("New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement.").

To state a claim for fraud in the inducement under New York law, a counterclaim-plaintiff must show that: "[i] a representation of fact, [ii] which is untrue and either known by defendant to be untrue or recklessly made, [iii] which is offered to deceive and to induce the other party to act upon it, [iv] and which causes injury." *PetEdge* v. *Garg,* 234 F. Supp. 3d 477, 490

(S.D.N.Y. 2017) (quoting *Suez Equity Inv'rs, L.P.* v. *Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001)).

Resolution of Plaintiff's motion turns on the interplay between Defendants' fraud and breach of contract claims. "Where a fraud claim is premised upon an alleged breach of contractual duties, and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie." *Cont'l Petroleum Corp.* v. *Corp. Funding Partners, LLC,* No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *10 (S.D.N.Y. Apr. 12, 2012) (brackets and internal quotation marks omitted) (quoting *McKernin* v. *Fanny Farmer Candy Shops, Inc.,* 574 N.Y.S.2d 58, 59 (2d Dep't 1991)). Despite this general rule, fraud and breach of contract claims can coexist in certain circumstances. *Wall* v. *CSX Transp. Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("[N]ot every fraud claim is foreclosed in an action also involving a contract."). To maintain a claim for fraud that does not merge with a breach of contract claim, Defendants must either "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."
*Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996); *see also Merrill Lynch & Co. Inc.* v. *Allegheny Energy, Inc.,* 500 F.3d 171, 183 (2d Cir. 2007); *Wild Bunch, S.A.* v. *Vendian Entertainment, LLC,* 256 F. Supp. 3d 497, 502 (S.D.N.Y. 2017).

Given the brevity of Defendants' allegations, the Court finds the facts as stated to be roughly in equipoise. While the Court ultimately concludes that Defendants' fraud and breach of contract claims have not merged, the daylight between the two claims is vanishingly small. For example, Defendants do not allege a legal duty separate from the duty to perform under the contract. In their opposition brief, Defendants argue that Plaintiff "had an independent duty to be truthful with Sellers because it made a partial statement regarding its efforts to perform[.]" (Def. Opp. 5). To be sure, New York law recognizes that a party to a business transaction has a duty to speak truthfully "where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth[.]" *Brass* v. *Am. Film Techs, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).[5] But this theory does not appear to advance Defendants' argument. For starters, the Counterclaim does not make any mention of partial statements about efforts to perform that were left uncorrected. (*See* Countercl. ¶¶ 30-37). Perhaps Defendants believe this to be implicit in the allegation that the APA was amended numerous times in reliance on Plaintiff's statements that it was still working to get financing and close the deal, but this

---

5      New York law also provides that parties to a business transaction must speak truthfully "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass* v. *Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Defendants' counterclaim does not plead any facts about the parties' comparative knowledge or what information was or was not accessible to them, nor do they make this point in their brief. Perhaps Defendants believe these facts to be implied — Plaintiff obviously knows more than Defendants concerning its due diligence efforts. But, again, Defendants do not adequately explain, beyond a conclusory statement that Karniol's representations were false, that they were acting on the basis of mistaken knowledge.

10

is far from clear, and Defendants may not amend their pleadings through legal argument in an opposition brief. *See Maxim Grp. LLC* v. *Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 308 (S.D.N.Y. 2010). At most, what the Counterclaim says is that Plaintiff made false representations many times. But it does not say in what regard these statements were untrue. The Court has trouble discerning from the Counterclaim what Plaintiff told Defendants and how, if at all, its story changed over time.

Defendants fare better with their argument that Plaintiff's statements were collateral or extraneous to the contract. Defendants allege that Plaintiff misrepresented the status of its efforts with respect to the tasks it needed to complete before the transactions closed by securing financing and lease arrangements. Defendants argue that these were statements of present existing fact that went to Plaintiff's present actions and state of mind, not to a future promise to perform or not. (Def. Opp. 5-6). The Court agrees. Defendants allege that they would not have agreed to the extensions of the Due Diligence Period if they had known that Plaintiff had not been truthful about its efforts. Though Defendants' allegations in this regard are terse at best, these statements are separable from Plaintiff's statements about what will be done in the future. *See Stewart* v. *Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992).

Finally, Defendants arguably plead special damages that are distinguishable from their alleged contractual damages. "For a claim of 'special damages' to permit assertion of both fraud and contract claims premised on similar facts, [Defendants] must show not that [their] damages were merely

11

atypical, but that they were 'a special consequence of the fraud and can be separated from the damages they can claim because of the alleged breach of contract.'" *Maricultura Del Norte* v. *World Bus. Capital, Inc.*, 159 F. Supp. 3d 368, 378-79 (S.D.N.Y. 2015). Defendants claim that they were damaged inasmuch as the Purchased Assets owned by Sellers were tied up in the APA from 2014 to 2016, and that these damages fell outside of the scope of the liquidated damages provision. (Countercl. ¶ 36). The Court takes no position as to whether losses flowing from Defendants' alleged inability to resell the Purchased Assets are recoverable under their breach of contract claim. That said, the Court finds the Counterclaim to allege plausibly that these damages are separable from those sought under the breach of contract claim. Because Defendants have indicated that Plaintiff's alleged misrepresentations were collateral to the initial agreement and give rise to arguably different damages, the Court finds that the breach of contract claim and fraud claim may exist together.

### 2. Defendants Fail to Plead Fraud with Particularity

The preceding discussion is, of course, only half of the inquiry, and the Court now considers the adequacy of Defendants' pleadings. As set forth herein, even though the fraud claim is not duplicative of the breach of contract claim, it is insufficiently pleaded under Rule 9(b).

To review, the Court counts four representations by Karniol that Defendants challenge in their fraud counterclaim: (i) Plaintiff was satisfied with the information it received from the Sellers, including information about the

Purchased Assets; (ii) Plaintiff had a genuine interest in the Purchased Assets and the ability to complete the transactions contemplated by the APA; (iii) Plaintiff was making good-faith efforts to secure appropriate financing and lease arrangements, and (iv) Plaintiff needed the additional time to complete the arrangements for its financing or an enforceable lease agreement with a tenant. (Countercl. ¶¶ 31-32). Defendants allege that these representations were false; that Karniol knew them to be false; and that Plaintiff neither had a present intention to complete the transactions nor engaged in good-faith efforts to secure appropriate financing and lease arrangements. (*Id.* at ¶ 34). These allegations, however, are but a bare recital of the elements of a fraud claim.

Defendants do not allege sufficient facts to satisfy Rule 9(b). While an alleged breach of contract may provide some measure of circumstantial evidence of fraudulent intent, it is not enough to give rise to a "strong inference" of fraud under Rule 9(b). "Contractual breach, in and of itself, does not bespeak fraud, and generally does not give rise to tort damages." *Mills* v. *Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir. 1993) (affirming dismissal of fraud claims under Rules 12(b)(6) and 9(b)). Defendants claim fraudulent intentions by merely stating that "[Plaintiff] did not have the present intentions to complete the transactions." (Countercl. ¶ 34). Without more, the Court cannot infer fraudulent intent, especially given that the failure to close the transaction may be undertaken for "legitimate business reasons." *Mills*, 12 F.3d at 1176 (declining "to infer fraudulent intent from the fact that [defendant]

13

made a number of contracts ... and never performed any of them" because "[a] contract may be breached for legitimate business reasons").

Defendants do not explain why they believe Plaintiff's statements to be untrue, or how and when did they came to learn that Plaintiff did not have the genuine interest, financing, or tenant arrangement needed to close the deal. Defendants appear to assume that because the deal did not close, all of Karniol's statements were false. This is conceivable, to be sure. But that is not enough. Defendants "have not nudged their claims across the line from conceivable to plausible," *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570), and for this reason the Court dismisses their fraud claim.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to dismiss is GRANTED. The parties are reminded that the period for fact discovery has been extended to June 29, 2018, but will be extended no further.

At the pretrial conference in the matter held on June 7, 2018, the Court advised the parties that it would take under advisement the parties' request for motion practice pursuant to Fed. R. Civ. P. 56 that would precede trial in the matter. The Court accepts the parties' arguments that summary judgment motions are likely to narrow the issues for trial and accordingly ORDERS the parties to propose a schedule for cross-motions within seven (7) days of the date of this Opinion and Order. In particular, the parties are instructed to

meet and confer to discuss ways to avoid needless or duplicative briefing, as, for example, by proposing a schedule that eschews reply briefs.

SO ORDERED.

Dated: June 14, 2018
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge