UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRODALE HOLDINGS LLC,

Plaintiff,

-v.-

BRISTOL HEALTHCARE INVESTORS,
L.P.; LYNCHBURG HEALTHCARE
INVESTORS, L.P.; DEMQUARTER
HEALTHCARE INVESTORS, L.P.;
SALEM NURSING & REHABILITATION
CENTER OF REFORM, INC.;
DOUGLAS K. MITTLEIDER,

Defendants.

16 Civ. 4254 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

At its core, this case depicts the slow-motion souring of a business

relationship over the course of two years, 152 amendments, and a fair number

of misrepresentations and omissions. On February 6, 2014, Plaintiff Trodale

Holdings LLC entered into an Asset Purchase Agreement (the "APA") to

purchase nursing homes from Defendants Bristol Healthcare Investors, L.P.

("Bristol"), Lynchburg Healthcare Investors, L.P. ("Lynchburg"), DemQuarter

Healthcare Investors, L.P. ("DemQuarter"), and Salem Nursing & Rehabilitation

Center of Reform, Inc. ("Salem-Reform") (together, "Sellers"). After signing the

APA, Plaintiff discovered facts suggesting that Sellers did not actually have the

authority to enter into the APA. Plaintiff also requested, but did not receive,

certain audited financial reports that Sellers were obligated to produce under

the APA.

Plaintiff tendered a Notice of Default on April 21, 2016, and filed this action against Sellers two weeks later. On July 18, 2016, Plaintiff filed an amended complaint that added Defendant Douglas K. Mittleider, the principal of the nursing home entities (together with Sellers, "Defendants"). All but one of the parties now cross-move for summary judgment in whole or in part.[1] In so doing, the parties lob numerous allegations of conduct and misconduct at each other. The Court has sifted through these various allegations, and has found that as to certain allegations of breach, the evidence is overwhelming. For these reasons, the Court grants in part Plaintiff's motion for partial summary judgment, and denies in full Defendants' cross-motion for summary judgment.

## BACKGROUND[2]

### A. Factual Background

#### 1. The Facilities

Plaintiff and Sellers entered into the APA on February 6, 2014, pursuant to which Plaintiff agreed to purchase a group of nursing home facilities in the

---

[1] On December 26, 2018, the Court stayed this matter solely as to Defendant Bristol in response to Bristol's Notice that a Chapter 11 Bankruptcy petition had been filed on its behalf in the United States Bankruptcy Court for the Eastern District of Tennessee. For this reason, references to "Sellers" or "Defendants" in the Discussion section of this Opinion do not include Bristol.

[2] The uncontested facts on which the Court relies herein are drawn from the parties' Local Rule 56.1 statements ("[Party] 56.1" (Dkt. #110, 114)) and responses ("[Party] 56.1 Opp." (Dkt. #116, 120)), the Asset Purchase Agreement ("APA" (Dkt. #112, Ex. 2)), the deposition transcript of Defendant Mittleider ("Mittleider Tr." (Dkt. #112, Ex. 10)), and the Declaration of Berel Karniol and attached exhibits ("Karniol Decl." (Dkt. #112)). For ease of reference, the Court refers to the Memorandum of Law in Support of Defendants' Motion for Summary Judgment as "Def. Br." (Dkt. #108); to Plaintiff's Memorandum of Law in Opposition of Defendants' Motion for Summary Judgment as "Pl. Opp." (Dkt. #119); to the Reply Memorandum of Law in Further Support of Defendants' Motion for

southern United States. (*See* APA). According to the APA, Plaintiff was initially to purchase The Cambridge House, The Carrington, The Stratford House, and Salem-Reform (together, the "Initial Facilities" or the "Nursing Home Facilities"). (*Id.* at § 1, Sched. A-1). The APA also afforded Plaintiff an option to purchase additional nursing homes in the future, including Westview Manor of Peabody, College Hills, Maple Heights, Riverwood Healthcare and Rehab, and Timberlake (together, the "Additional Facilities"). (*Id.* at § 16, Ex. J). In addition, Plaintiff had an option to purchase the Amara Health Care & Rehab facility. (*Id.* at § 17). Finally, the APA stated that "Seller will work together in good faith with the owner of the Tuskegee Facility in an effort to reach an agreement regarding the sale of the Tuskegee Facility to Purchaser[.]" (*Id.* at § 18).

## 2. The Representations and Warranties

The APA included a series of representations and warranties made by Sellers to Plaintiff about the conditions of the properties and assets to be transacted. (APA § 8). Four warranties of particular significance to resolving the parties' cross-motions are contained in APA Sections 8(a), 8(h), 8(n), and 8(s). Section 8(a) states in relevant part that "Seller has full power and right to enter into and perform the respective obligations under this Agreement." (*Id.* at

---

Summary Judgment as "Def. Reply" (Dkt. #121); to the Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment as "Pl. Br." (Dkt. #113); to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment as "Def. Opp." (Dkt. #115); and to the Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Partial Summary Judgment as "Pl. Reply" (Dkt. #123).

§ 8(a)). It is undisputed that, at the time of the execution of the APA, the

Salem-Reform facility was the subject of a receivership action that had been

filed back in 2011; a receiver was ultimately appointed for that facility on

March 18, 2014. (Pl. 56.1 ¶¶ 15-16; Def. 56.1 Opp. ¶¶ 15-16). On May 28,

2014, the receiver filed an Emergency Motion to Compel, stating:

> The Receiver has been very clear on multiple occasions,
> including at the outset of the Receivership, that the
> Defendants have no right to attempt to sell the assets of
> the Receivership Estate. Nonetheless, the Defendants
> are intent on attempting to close on the sale of the estate
> assets, even going so far as to take possession of
> deposits from the purchase for the sale of estate assets.
> The Receiver has initiated its own efforts to market and
> sell the assets of the Receivership Estate in accordance
> with the Receiver Order and has clearly communicated
> this to the Defendants.

(Karniol Decl., Ex. 9 at ¶¶ 11-12; *see also* Pl. 56.1 ¶ 19; Def. 56.1 Opp. ¶ 19

(contesting whether Mittleider withheld information from Plaintiff, but not the

existence or contents of the Motion to Compel)). It is undisputed that the

transaction that sparked the receiver's Emergency Motion to Compel was that

memorialized in the APA. (Pl. 56.1 ¶ 20; Def. 56.1 Opp. ¶ 20).

Section 8(h) states in relevant part that there are and would be no leases

or occupancy rights affecting the properties, "currently, and as of the Closing

Date," other than the leases with the enumerated existing operators of the

facilities. (APA § 8(h)). It is uncontested that, in 2015, Mittleider transferred

the leases for both the Cambridge and the Carrington facilities from the

previous operators to new entities. (Pl. 56.1 ¶¶ 25-26; Def. 56.1 Opp. ¶¶ 25-

26).

Section 8(n) states in relevant part that there are no pending or threatened litigations or investigations involving the purchased assets, and no *qui tam* actions pending or threatened "against Seller, Old Operator or any of their affiliates," other than those "set forth on Schedule 8(n)." (APA § 8(n)). In addition to the receivership action against the Salem-Reform facility, it is undisputed that in 2009, a *qui tam* action (the "Qui Tam Action") was filed against Mittleider and other entities, including AltaCare, which was the manager of the Salem-Reform, Lafayette, Cambridge, Carrington, Amara, and Riverwood facilities. (Pl. 56.1 ¶¶ 75-79; Def. 56.1 Opp. ¶¶ 75-79).

Finally, and as something of a backstop, Section 8(s) asserts that no other representation or warranty in the APA contains a false statement or material omission. (APA § 8(s)).

### 3. Other APA Provisions and Amendments

The APA provided for an initial due diligence period of 75 days for Plaintiff to conduct site inspections and review "the books and records related to the financial condition and the operations [of the Initial Facilities.]" (APA § 4(a)). In particular, it recited that Plaintiff's "request for due diligence documentation" included "CPA audited financial statements for 2010, 2011, 2012 & 2013 YTD including balance sheets and income statements identifying all accounts payable and other indebtedness." (*Id.* at Ex. C, B-1). Sellers were obligated to provide "Due Diligence Materials" to Purchaser within 10 days of the execution of the APA. (*Id.* at § 4(b)). Indeed, Plaintiff had the right to render the contract null and void, and to receive a refund of its deposit, if it

was not satisfied with the due diligence inspections and "notifie[d] Seller thereof in writing on or prior to the end of the Due Diligence Period." (*Id.*). It is undisputed that none of the Defendants provided Plaintiff with the required audited financial statements. (Pl. 56.1 ¶¶ 72-73; Def. 56.1 Opp. ¶¶ 72-73).[3]

The parties also agreed on terms related to the various operators of the nursing homes. The APA stated that "each Old Operator shall enter into an Operations Transfer Agreement [an "OTA"] *in substantially the form* annexed hereto as Exhibit L … with each New Operator," where Plaintiff was to enter leases with the New Operators. (APA 1, Ex. A-1 (enumerating the Old Operators) (emphasis added)). Schedule L of the APA, titled "Form of Operations Transfer Agreement" or "Form of OTA," includes a statement that each Old Operator would "keep the Property free and clear of all liens, claims and encumbrances (other than Permitted Exceptions (as defined in the APA)) and promptly remove any created or caused by Old Operator or its employees or agents." (APA, Ex. L, § 2(b)(x)). It is undisputed that at least one judgment, in the sum of $4,988,743.20, was entered against the Old Operator HP/Cambridge House. (Pl. 56.1 ¶ 65; Def. 56.1 Opp. ¶ 65).

Over a two-year period, the parties amended the APA 152 times. (Karniol Decl., Ex. 4 at 181). Each amendment contained a clause stating either, "All other terms of the Purchase Contract shall remain the same," or "All other

---

[3]    Mittleider later testified that the documents were not provided because such statements "did not exist" (Mittleider Tr. 130-31), and that the APA's Exhibit C reference to such documents "was a Scrivener error" (*id.* at 132).

terms of the Purchase Contract as amended shall remain the same." (Karniol Decl., Ex. 3-4; *see also* Pl. 56.1 ¶ 7; Def. 56.1 Opp. ¶ 7)).

### 4. The Deposits and the Notice of Default

Pursuant to the APA, Plaintiff tendered an initial deposit of $100,000.00, and a second deposit of $1,000,000.00. (Pl. 56.1 ¶¶ 4-5; Def. 56.1 Opp. ¶¶ 4-5). As part of later amendments to the APA, Sellers released $700,000.00, and Plaintiff made a third deposit of $100,000.00. (*Id.* at ¶¶ 8, 10). Based on these numbers and the Court's own calculations, the Court supposed that $500,000.00 of deposit funds tendered by Plaintiff remain in escrow. However, the parties' Rule 56 statements agree that "[t]here is currently $400,000.00 ... of deposits tendered by Trodale in connection with the APA being held in escrow." (*Id.* at ¶ 11).

On April 21, 2016, Plaintiff sent Defendants a notice of default. (Karniol Decl., Ex. 5). The notice asserts defaults in the forms of loss of ownership of certain facilities to be sold under the APA; the sale of one facility (College Hills) to a third party; the failure to deliver audited financial statements as required by the APA's due diligence provision; the failure of Defendants to inform Plaintiff as to allegedly material adverse changes to some facilities; and the existence of judgments against the facilities, Sellers, and the Old Operators. (*Id.*).

### B. Procedural Background

Plaintiff initiated this action against Sellers in New York State Supreme Court, Kings County, on May 2, 2016. (Dkt. #1). Sellers removed to the

Southern District of New York on June 8, 2016. (*Id.*). Plaintiff filed its Second Amended Complaint (the "SAC") on January 27, 2017. (Dkt. #58). Defendants moved to dismiss the SAC (Dkt. #73), which motion the Court granted in part and denied in part (Dkt. #79). *See Trodale Holdings LLC* v. *Bristol Healthcare Inv'rs, L.P.*, No. 16 Civ. 4254 (KPF), 2017 WL 5905574, at *2-3 (S.D.N.Y. Nov. 29, 2017) ("*Trodale I*"). Plaintiff's remaining claims are for breach of warranty, breach of contract (against Sellers only), specific performance, fraudulent concealment, vendee's lien, and promissory estoppel (against Mittleider only).

On December 15, 2017, Defendants answered and filed counterclaims for fraud and breach of contract based on Plaintiff's failure to close any of the APA-contemplated transactions. (Dkt. #81). Plaintiff moved to dismiss the fraud counterclaim (Dkt. #85), and the Court granted the motion on June 14, 2018 (Dkt. #101). *See Trodale Holdings LLC* v. *Bristol Healthcare Inv'rs, L.P.*, No. 16 Civ. 4254 (KPF), 2018 WL 2980325, at *1 (S.D.N.Y. June 14, 2018) ("*Trodale II*"). Plaintiff filed an answer to the remaining breach of contract counterclaim on June 25, 2018. (Dkt. #104).

On July 23, 2018, Plaintiff moved for partial summary judgment on its claims for breach of warranty and breach of contract, and for summary judgment dismissing Defendants' remaining breach of contract counterclaim. (Dkt. #109). On the same date, Defendants cross-moved for summary judgment on all remaining causes of action. (Dkt. #107). The parties filed

opposition briefs on August 16, 2018 (Dkt. #115, 119), and replies on August 27, 2018 (Dkt. #121, 123).

## DISCUSSION

### A.    Summary Judgment Motions

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[4] A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some

---

[4]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

Local Civil Rule 56.1 requires that the movant file a "short and concise statement ... of the material facts as to which the moving party contends there is no genuine issue to be tried," and each proffered fact will be deemed admitted "unless specifically controverted by a correspondingly numbered paragraph[.]" Local Civ. R. 56.1(a)-(c). Each statement must be supported by a citation to admissible evidence. *Id.* at 56.1(d). But a reviewing court "may not rely solely on the statement of undisputed facts[,] ... [i]t must be satisfied that the citation to evidence in the record supports the assertion." *Vt. Teddy Bear Co.*, 373 F.3d at 244 (citing *Giannullo* v. *City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)). A district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Simpson* v. *City of New York*, 793 F.3d 259, 265 (2d Cir. 2015). It is not appropriate for the Court to make credibility assessments or resolve conflicting versions of the events presented — these are essential questions for a jury. *Id.*

**B.    The Court Grants in Part Plaintiff's Motion for Summary Judgment**

**1.    The Court Grants in Part Plaintiff's Motion for Summary Judgment on Its Breach of Warranty Claim**

**a.    There Is No Genuine Dispute That Defendants Breached the Warranties in APA Sections 8(a), 8(h), 8(n), and 8(s)**

A warranty is "an assurance by one party to a contract of the existence of a fact upon which the other party may rely." *CBS, Inc.* v. *Ziff-Davis Publ. Co.*, 75 N.Y.2d 496, 503 (1990) (quoting *Metro. Coal Co.* v. *Howard*, 155 F.2d 780, 784 (2d Cir. 1946)).  Indeed, a warranty "*amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue*[.]"  *Id.* (emphasis in *Ziff-Davis*).

Under New York law, "upon showing that: [i] plaintiff and defendant entered into a contract; [ii] containing an express warranty by the defendant with respect to a material fact; [iii] which warranty was part of the basis of the bargain; and [iv] the express warranty was breached by defendant, plaintiff is entitled to be indemnified for any damages incurred as a result of such breach." *Promuto* v. *Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999).  "The right to indemnification depends only on establishing that the warranty was breached.*" Ziff-Davis*, 75 N.Y.2d at 503-04.  The APA here expressly states that Plaintiff's deposit is to be returned "[i]f prior to the Closing, Seller shall default under any covenant, obligation or closing condition

or materially breach any representation or warranty set forth herein (which default is not waived in writing by Purchaser)[.]"  (APA § 12).

Sellers' representations and warranties in the APA were "made as of the date hereof [February 6, 2014, the execution date for the APA], and shall be remade as of the Closing Date."  (APA § 8).  Therefore, there are two possible points in time where a breach could have occurred: on February 6, 2014, or at the Closing Date.  And while no closing ever occurred, Plaintiff may establish a breach based on the promised closing date warranties by showing that Defendants rendered impossible the remaking of the warranties.

While, as noted, there are many facts that are disputed by the parties, there are undisputed facts that demonstrate as a matter of law that Sellers breached a number of the APA warranties, both as of February 6, 2014, and also by rendering it impossible to remake the warranties at closing.  *First*, Section 8(a) of the APA states:

> Seller has full power and right to enter into and perform the respective obligations under this Agreement and the Other Documents [defined as "all documents to be executed and delivered pursuant" to the APA (*id.* at § 5(a)(ii)(12))], including, without being limited to, conveying the Property and the other Purchased Assets.

(*Id.* at § 8(a)).  It is uncontested that, as of February 6, 2014, none of the Defendants actually owned the real estate where the Salem-Reform facility was located.  (Pl. 56.1 ¶ 24; Def. 56.1 Opp. ¶ 24 (contesting solely whether Plaintiff learned this fact from Defendants); s*ee also* Karniol Decl. ¶ 9; Mittleider Tr. 69-71).  It is further uncontested that the Salem-Reform facility was the subject of a receivership action that had been filed in 2011.  (Pl. 56.1 ¶ 15; Def. 56.1

Opp. ¶ 15; *see also* Karniol Decl., Ex. 6).  The court in that action issued a receivership order and appointed a receiver for the Reform facility on March 18, 2014.  (Karniol Decl., Ex. 7).  On the basis of these facts alone, the Court finds that Defendants breached the Section 8(a) warranty.[5]

In this same vein, Mittleider testified that no signatory to the APA owned or had an option to purchase the real estate where the Westview Manor additional facility was located.  (Mittleider Tr. 85-86).  And as for Timberlake, another of the Additional Facilities, Mittleider testified that the property was the subject of a bankruptcy action that had been filed in 2005, and which eventually led to its sale approximately one to two years after the execution of the APA.  (Pl. 56.1 ¶¶ 58-60; *see also* Mittleider Tr. 111-12; Karniol Decl., Ex. 15).  In the context of the instant motions, Defendants attempt to deny these facts about Westview and Timberlake, but they offer no evidence to the contrary or basis on which to contest Mittleider's testimony.  (Def. 56.1 Opp. ¶¶ 46, 58-60).  Accordingly, the Court finds that the record shows Defendants

---

[5]    Defendants argue that Plaintiff learned of litigation surrounding the Salem-Reform Facility "before it entered into APA amendments and before it made a declaration that the deposit for the Cambridge House was 'hard' [i.e., non-refundable]."  (Def. Opp. 3).  The argument proceeds as follows:  By March 3, 2014, before any APA amendments were made, Plaintiff's attorneys were in communication with the counsel to the Receiver for the Salem-Reform facility; on March 9, 2014, Plaintiff's attorneys reviewed a letter of intent regarding the Reform facility; and Mittleider supplied Plaintiff with the pleadings the Receiver filed in the litigation.  (*Id.* at 3-4).  Plaintiff even submitted a bid to the Receiver to purchase the property directly.  (*Id.* at 4).  As a result, Defendants urge the Court to "view with considerable suspicion" the notion that Sellers withheld information about the litigation surrounding the Salem-Reform facility.  (*Id.*).  Yet, none of these assertions disproves the undisputed fact that on February 6, 2014, Defendants made a warranty that Sellers had "full power and right" to sell the Salem-Reform facility, and that as of that date the warranty was not true.

also breached the Section 8(a) warranty that they had full power and right to convey the Westview and Timberlake properties.[6]

Put simply, at the time the APA was executed, Sellers did not have "full power and right ... [to convey] the Property and the other Purchased Assets," where Defendants lacked ownership of, or an option to purchase, those properties or assets, or where the properties were the subject of receivership and bankruptcy actions. Even if Mittleider could potentially have coordinated with, or assisted, the Salem-Reform receiver to sell that property (*see* Mittleider Tr. 114), such coordination would not have afforded him the "*full* power and right" to convey.

As it turns out, sales of, or encumbrances on, the properties and assets that occurred after the execution of the APA also breached the promise to reassert the warranty of full power to convey as of the Closing Date. It is uncontested that, on March 18, 2014, the court in the Salem-Reform receivership action issued a receivership order and appointed a receiver for that facility. (Karniol Decl., Ex. 7; Pl. 56.1 ¶ 16; Def. 56.1 Opp. ¶ 16). It is also uncontested that, in October 2015, the College Hills facility and its operations, were sold to a third party. (Pl. 56.1 ¶ 50; Def. 56.1 Opp. ¶ 50; *see also* Mittleider Tr. 87-90).[7] Contrary to Defendants' assertions (*see* Def. Br. 12; Def.

---

[6]     Mittleider also testified that no signatory to the APA owned the real estate where the Amara facility was located. (Mittleider Tr. 82). The parties have not included reference to this testimony in their Rule 56.1 statements, so the Court does not rely on the testimony to find a breach.

[7]     Defendants point to language in the forty-third and subsequent amendments to the APA that states that "the Seller shall have the ability to show the Assets," and that omits a prior statement from the forty-second amendment to the effect that "however the Seller

Opp. 12-13), the fact that the parties never closed on the APA does not negate

Plaintiff's option to purchase the Additional Facilities.  As established in

Section 16 of the APA, Sellers promised Plaintiff an option to purchase the

Additional Facilities that was to commence at the Closing Date and end two

years later.  Sellers were on the hook for keeping that representation viable

until the expiration of the option period.  *See, e.g.*, *In re Riodizio, Inc.*, 204 B.R.

417, 422 (Bankr. S.D.N.Y. 1997) ("An option contract is essentially an

enforceable promise not to revoke an offer ... the optionor must keep the option

open.").

While these breaches alone are sufficient for summary judgment in

Plaintiff's favor on its breach of warranty claim, the Court continues its

analysis of other warranties in the APA.  *Second*, APA Section 8(h) states:

> Other than the leases with the Old Operators and as set
> forth on Schedule 8(h), there are not currently, and as
> of the Closing Date there shall not be, any occupancy
> rights (written or oral), leases or tenancies presently
> affecting the Nursing Home Facilities and the portion of
> the Property on which it is located, other than any
> occupancy rights of any residents of the Nursing Home
> Facilities.

(APA § 8(h)).  But in 2015, Mittleider transferred H/P Cambridge Inc.'s leases

for both the Cambridge and the Carrington facilities to new entities.  (Pl. 56.1

---

may not enter into any agreements during said time period without the Purchaser's
written consent." (Def. Br. 13).  Defendants argue that the language authorizing the
showing of the property, absent the language prohibiting sale without Plaintiff's
consent, means Defendants were entitled to sell the College Hill facility.  (*Id.*).
Defendants' reading of the amendment language is both illogical and belied by other
language in each of these amendments making clear that "all other terms" of the APA
remained the same, including the terms requiring that College Hills be sold to Plaintiff.
(*See* Pl. Opp. 16 n.11).

¶¶ 25-26; Def. 56.1 Opp. ¶¶ 25-26 (denying legal conclusion that the statements are material facts or breaches of the APA, but not denying the transfer of leases); *see also* Mittleider Tr. 25, 37-40).  Those transfers breached the warranty in APA § 8(h) by creating new leases affecting the Nursing Home Facilities prior to the Closing Date.

Whether the entities to which Mittleider transferred the leases were controlled by him is of no import, as the plain text of the APA warranty does not authorize the creation of new leases affecting the Nursing Home Facilities so long as those leases are controlled by Mittleider.  Likewise, Defendants' responses that "no representations were made about the ownership of the operating companies"; that the APA did not contemplate that Plaintiff would purchase ownership of the operating companies; and that Plaintiff has failed to establish that the new lessees "were unwilling or unable to make OTAs" (*see* Def. Opp. 8-9), are plainly irrelevant, because the breach here concerned the creation of new leases, not ownership of the operating companies.[8]  Moreover, Defendants previously argued in this Court for dismissal of Plaintiff's claims against the recipients of the new leases because those recipients were not signatories to the APA; having succeeded, Defendants cannot now claim that

---

[8]  Regarding the Stratford House specifically, Defendants assert that Section 20(e) of "the APA specifically indicated Trodale's acknowledgement of a dispute as to the existence of a valid lease with a third party for the facility[.]" (Def. Opp. 10).  Defendants note that the March 1, 2017 lease was made after the APA expired.  (*Id.*).  The Court does not base its finding of breach on the lease for the Stratford facility.  Nonetheless, that the APA acknowledges a material dispute over the Stratford lease shows that the identity of the lessee was material to the APA and supports the Court's finding that transferring leases for the other facilities was a material breach.

the leases were not actually transferred because their recipients are one and the same with Defendants.

*Third,* Section 8(n) states:

> Except as set forth on Schedule 8(n), there are no pending or threatened litigation, investigations, claims, lawsuits, governmental actions or other proceedings, including, without limitation, any desk audit or full audit, involving the Purchased Assets, the Property, the Improvements, the Nursing Home Facilities or the operation thereof before any court, agency or other judicial, administrative or other governmental or quasi-governmental body or arbitrator. Except as set forth on Schedule 8(n), there are no qui tam actions pending or threatened against Seller, Old Operator or any of their affiliates.

(APA § 8(n)). It is undisputed that Defendants never provided Plaintiff with a Section 8(n) litigation schedule. (Pl. 56.1 ¶ 101; Def. 56.1 Opp. ¶ 101). Therefore, there were no exceptions to the Section 8(n) warranty, at least as of the date of execution of the APA. Nonetheless, as of that date, it is uncontested that properties and assets were implicated in multiple pending or threatened actions, including the Salem-Reform receivership action filed in 2011 (Pl. 56.1 ¶ 15; Def. 56.1 Opp. ¶ 15), and the Qui Tam Action filed in 2009 (Pl. 56.1 ¶¶ 75-79; Def. 56.1 Opp. ¶¶ 75-79).

The Qui Tam Action alleged fraudulent misconduct in multiple nursing home facilities, including specifically The Cambridge House. (Pl. 56.1 ¶ 83; Def. 56.1 Opp. ¶ 83). As Mittleider was the principal of the nursing home entities (Dkt. #17), and as AltaCare was a manager of these facilities, they were affiliates of Sellers, such that Section 8(n) required disclosure to Plaintiff of the Qui Tam Action against them. Defendants failed to disclose the existence of

17

the Qui Tam Action to Plaintiff.  (Pl. 56.1 ¶ 85; Def. 56.1 Opp. ¶ 85).  Therefore, these facts establish yet another breach of warranty.

*Fourth*, Section 8(s) states: "No representation or warranty by or on behalf of Seller contained in this Agreement … contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein[.]"  (APA § 8(s)).  As the Court has found that Sellers breached other warranties through false statements and material omissions, so too did they breach the Section 8(s) warranty.

The Court is not persuaded by Defendants' argument that the Section 8 warranties do not apply to the Additional Facilities or the Amara facility.  (*See* Def. Opp. 14-15).  The Section 8(a) warranty expressly applies to "this Agreement and the Other Documents."  (APA § 8(a)).  The APA elsewhere defines "Other Documents" as "all documents to be executed and delivered pursuant" to the APA.  (*Id.* at § 5(a)(ii)(12)).  Plaintiff's right to an option to purchase the Additional Facilities listed in Exhibit J of the APA falls within the scope of "this Agreement and the Other Documents."  Thus, even if Defendants were correct as to Section 8(h) and 8(n), which they are not, Plaintiff would still have established a breach of the Section 8(a) warranty and, by extension, the Section 8(s) warranty.

> ### b.  There Are Genuine Disputes of Fact as to Whether Defendants Breached the Warranties in APA Sections 8(g) or 8(i)

The Court does *not* base its grant of summary judgment on Plaintiff's claims of breach of warranty of Sections 8(g) and 8(i).  Section 8(g) contains a

warranty that "Except for Permitted Exceptions, the Seller has good and marketable title to the Purchased Assets. The Purchased Assets are free and clear of all liens and encumbrances, other than Permitted Exceptions." (APA § 8(g)). "Purchased Assets" are defined here to include "all of the tangible and intangible assets which comprise or are used or are held for use in connection with or are necessary to the operation of the business at the Nursing Home Facilities." (*Id.* at § 1(a)). "Permitted Exceptions," in turn, are defined as "all matters set forth on Exhibit D hereto, and any other liens and encumbrances accepted or deemed accepted by Purchaser hereunder." (*Id.* at § 4(c)). Exhibit D recognizes solely "Standard Permitted Exceptions that are customary in the jurisdictions in which the Nursing Home Facilities are located, provided that none of the same render title unmarketable." (*Id.* at Ex. D).

Plaintiff argues that Defendants failed to disclose that there was a nearly $5 million judgment against one of the Old Operators, H/P Cambridge Inc., as well as judgments against Mittleider. (Pl. 56.1 ¶¶ 63-64; *see* Def. 56.1 Opp. ¶¶ 63-64 (denying without pointing to any evidence to the contrary); *see also* Karniol Decl., Ex. 16; Mittleider Tr. 137). Defendants' brief argues to the contrary that the judgment was disclosed, relying for support on an email chain from August 4, 2015, in which Plaintiff's representative stated that the judgments "have to be addressed" and that "the first step is to obtain more information." (Def. Opp. 11). This piece of evidence would seem to hurt Defendants' position, since it clarifies that Plaintiff believed it lacked full information about the judgments. Nonetheless, Plaintiff has not established

that the failure to disclose was a breach of the Section 8(g) warranty because the Old Operators were not parties to the APA, and Plaintiff has identified no evidence in the record that judgments against the Old Operators would have clouded Defendants' titles or ability to perform under the APA.

Nor has Plaintiff established that the disclosure of this information was mandated by Sections 2(b)(x) or 18(d) of the OTA. (*See* Pl. Br. 10 n.6). Section 2(b)(x) requires that the Old Operators keep the properties free from liens, claims, and encumbrances, but says nothing about judgments against the Old Operators themselves. (APA, Sched. L, § 2(b)(x)). Section 18(d) concerns warranties that the Old Operators were to make, which do not apply here because the Old Operators are not parties in this suit. (*Id.* at § 18(d)).

The Court is similarly unable to find, as a matter of law, a breach of APA Section 8(i), which provides:

> Seller currently maintains in good standing and full force all of the material certificates, licenses and permits from all applicable governmental authorities in connection with the ownership, use, occupancy, operation and maintenance of the Property and the Nursing Home Facilities as necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

(APA § 8(i)). Plaintiffs have presented insufficient evidence to support a summary judgment finding that this warranty was breached. To be sure, the Tuskegee Facility lost its Medicare and Medicaid provider agreements in 2013-2014. (Mittleider Tr. 146-47; Karniol Decl. ¶ 18). But the APA states that the Tuskegee Facility is expressly "excluded from the transactions contemplated by

this Agreement." (APA § 18). Therefore, the Section 8(i) warranty does not apply.

### c. There Is No Genuine Dispute That Plaintiff Did Not Waive Its Rights Under the APA Warranties

Defendants contend that any breaches on their part were waived by Plaintiff's conduct. The Court disagrees. Under New York law, provisions of a contract that require a waiver to be in writing are valid and enforceable. *See, e.g.*, *DBT Gmbh* v. *J.L. Min. Co.*, 544 F. Supp. 2d 364, 379 (S.D.N.Y. 2008); *Prime Income Asset Mgt., Inc.* v. *Am. Real Estate Holdings L.P.*, 82 A.D.3d 550, 551 (1st Dep't 2011); *Flair Broadcasting Corp.* v. *Powers*, 733 F. Supp. 179, 186 (S.D.N.Y. 1990).

Multiple provisions of the APA require that waivers be in writing. Section 5(a) states that Plaintiff's obligation to close the transactions is subject to conditions precedent "or the waiver thereof by Purchaser, which waiver shall be binding upon Purchaser only to the extent made in writing on or prior to the Closing Date." (APA § 5(a)). Section 20(d) provides that "No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder." (*Id.* at § 20(d)). Section 12 requires the return of the deposit if "prior to the Closing, Seller shall default under any covenant, obligation or closing condition or materially breach any representation or warranty set forth herein (which default is not waived in writing by Purchaser)[.]" (*Id.* at § 12(a)). Defendants have identified no amendment to the APA that contradicts or otherwise eliminates the written waiver requirement. Therefore, the clear

language of the APA, confirmed by that portion of each amendment that recited that all other terms of the APA remained the same, precludes waiver without an express writing.

It is also undisputed that no written waiver exists. (Pl. Br. 24; Pl. Opp. 26-27). Defendants fail to respond to the argument that the APA requires all waivers to be in writing, and that such clauses are enforceable. (*See* Pl. Reply 2). Accordingly, Defendants have conceded the point that written waiver was required, and that Plaintiff did not waive its rights in writing. *See Palmieri* v. *Lynch*, 392 F.3d 73, 87 (2d Cir. 2004). Nonetheless, the Court undertakes an independent analysis and concludes that there is no basis on which to find Plaintiff's waiver, written or not.

Defendants argue that Plaintiff waived the breaches of warranty by negotiating and signing numerous amendments to the APA. (Def. Br. 16-17; Def. Opp. 3-8). Even though Sellers failed to make certain disclosures prior to the February 6, 2014 execution of the APA, and even though Defendants concede that their APA "disclosures were not formally updated," Defendants reason that Plaintiff had actual knowledge — acquired "both independently and by virtue of its ongoing dialogue with Sellers" — of all of the relevant information prior to executing the amendments, the last of which was signed on April 8, 2016. (Def. Br. 15-17; Karniol Decl., Ex. 4 at 183). For instance, Defendants assert that "it is likely that" Plaintiff's attorneys were aware of the existence of the Qui Tam Action by March 28, 2014. (Def. Opp. 16 n.9). Or, as another example, Defendants assert that "they discussed with Trodale all

litigation that would have been scheduled prior to Trodale requesting and making APA amendments." (Def. 56.1 Opp. ¶ 101). And as legal support, Defendants rely on the rule that where a seller discloses facts that would constitute a breach of warranty "and the buyer closes with full knowledge and acceptance of those inaccuracies, the buyer cannot later be said to believe he was purchasing the Seller's promise respecting the truth of the warranties." *Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).

It is generally the case that a contracting party's knowledge that a warranty is false, without more, does not generally excuse the other party's breach of that warranty. *See CBS Inc.* v. *Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 503 (1990) ("The critical question is not whether the buyer believed in the truth of the warranted information, as Ziff-Davis would have it, but whether it believed it was purchasing the seller's promise as to its truth." (internal quotation marks, citation, and alterations omitted)). But *Ziff-Davis* does contain an exception for circumstances in which a buyer closes on a transaction with full awareness of the breach of a warranty. *See Galli* v. *Metz*, 973 F.2d 145, 151 (2d Cir. 1992). Unfortunately for Defendants, that exception does not apply here because Plaintiff did not close on the transaction.

That Plaintiff "chose to proceed" with a series of amendments to the APA is not equivalent to a purchaser closing on a transaction with full knowledge and acceptance of facts that contravene a warranty. Furthermore, a buyer that expressly preserves its rights may argue a claim for breach. *See Rogath* v.

*Siebenmann*, 129 F.3d 261, 265 (2d Cir. 1997). Here, Plaintiff expressly preserved its rights by requiring that waivers be in writing, and each amendment states that all other terms of the APA, originally or as amended, "shall remain the same." (Karniol Decl., Ex. 3-4).[9] Defendants have failed to establish any waiver by Plaintiff based on the record evidence before the Court.

In sum, the Court grants Plaintiff's partial motion for summary judgment for its claims for breach of the warranties required by APA Sections 8(a), 8(h), 8(n), and 8(s).

### 2. The Court Grants in Part and Denies in Part Plaintiff's Motion for Summary Judgment on Its Breach of Contract Claim

#### a. There Is No Genuine Dispute That Defendants Breached the APA's Due Diligence Requirements

Under New York law, the elements of a claim for breach of contract are "[i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages." *Harsco Corp.* v. *Segui*, 91 F.3d 337, 348 (2d Cir. 1996). There must be a causal connection between the breach and the damages claimed. *See Nat'l Mkt. Share, Inc.* v. *Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

---

[9] Even post-closing, a buyer may still sustain a claim for breach of warranty if the buyer gained knowledge of the falsity of the warranty from a source other than the seller. *See Rogath* v. *Siebenmann*, 129 F.3d 261, 265 (2d Cir. 1997). Here, to the extent that Plaintiff became aware of the breaches, the parties dispute whether it did so through sources other than Defendants. (*See, e.g.*, Pl. 56.1 ¶ 17; Def. 56.1 Opp. ¶ 17 (contesting whether Plaintiff learned of the existence of the Salem-Reform receivership action from Defendants or from the receiver)). This dispute of material fact precludes the Court from relying on the *Rogath* rule at the summary judgment stage, and hence the Court does not decide on this basis.

The record evidence shows that Plaintiff adequately performed under the APA by providing the required deposit funds, and that Defendants then breached the APA. It is undisputed that Plaintiff tendered an initial deposit of $100,000.00 on or about February 6, 2014, and a further deposit of $1,000,000.00, in accordance with the APA, as well as a third deposit of $100,000.00 in accordance with an APA amendment. (Pl. 56.1 ¶¶ 4-5, 10; Def. 56.1 Opp. ¶¶ 4-5, 10). Defendants' contention that Plaintiff's sole established act under the contract was to "ask for more time so that it could perform" (Def. Opp. 17), is therefore unconvincing.

Defendants were not as punctilious as to their side of the bargain. In addition to the breaches of warranty discussed above, Defendants failed, at minimum, to perform their obligations under the due diligence portion of the agreement. Exhibit C of the APA lists the "Buyer's Request for Due Diligence Documentation," and includes "CPA audited financial statements for 2010, 2011, 2012 & 2013 YTD including balance sheets and income statements identifying all accounts payable and other indebtedness." (APA, Ex. C § B(1)). It is undisputed that Defendants never provided Plaintiff with the audited financial statements. (Pl. 56.1 ¶¶ 72-73; Def. 56.1 Opp. ¶¶ 72-73). Mittleider testified that neither he nor any of the Defendants ever provided Plaintiff with audited financial statements because such statements "did not exist" (Mittleider Tr. 130-31), and that the APA's Exhibit C reference to such documents "was a Scrivener error" (*id.* at 132). That statement does not suffice to create a genuine dispute of material fact. No reasonable factfinder could

find, on the basis of Mittleider's bald assertion, and in the face of all of the record evidence to the contrary, that the requirement for audited financial statements was a typo. Accordingly, the Court finds that Defendants breached the APA by failing to provide such statements.

Plaintiff has also established damages caused by the breach. Section 12 of the APA expressly provides for the return of the deposit: "If prior to the Closing, Seller shall default under any covenant, obligation or closing condition or materially breach any representation or warranty set forth herein (which default is not waived in writing by Purchaser)[.]" (APA § 12). Defendants' breach of both their warranties and their obligations to perform under the APA has therefore caused, at minimum, damages entitling Plaintiff to a return of some of its deposit monies still in escrow.

Defendants' arguments in opposition merit only a brief mention. Defendants contend that Plaintiff fails to satisfy the causation element of a breach of contract claim because it does not show "that it was ready to close" or "that Sellers were unable to transfer the properties free and clear of all tenancies and other occupancies," without material adverse changes in the operations of the facilities. (Def. Opp. 18). The fact remains, however, that Plaintiff need not show that it was ready to move forward to close the deal *despite* Defendants' breaches, nor is Plaintiff required to prove that Defendants breached *every* portion of the APA in order to show breach of contract. Plaintiff's motion for summary judgment in its favor on its breach of contract

claim for breach of the due diligence requirement to provide audited financial statements is granted.

### b. The Court Denies Summary Judgment on Plaintiff's Claim for Breach of Contract Regarding the Tuskegee Facility

"Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract.... In some circumstances, however, preliminary agreements can create binding obligations." *Adjustrite Sys., Inc.* v. *GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998).[10] To determine whether parties have entered a preliminary agreement that imposes an obligation to negotiate in good faith, courts must consider five factors: "[i] whether the intent to be bound is revealed by the language of the agreement; [ii] the context of the negotiations; [iii] the existence of open terms; [iv] partial performance; and [v] the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Brown* v. *Cara*, 420 F.3d 148, 153, 157 (2d Cir. 2005); *see*

---

[10]     *See Brown* v. *Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (internal citations omitted):

> The extent of the obligations created depend on the preliminary agreement in question, though, in general, "binding preliminary agreements fall into one of two categories." These two types are most authoritatively described in *Tribune*, where Judge Leval, collecting the relevant New York law, describes "Type I" preliminary agreements as "complete," reflecting a meeting of the minds on "all the issues perceived to require negotiation." Because it is complete, a Type I preliminary agreement "binds both sides to their ultimate contractual objective." "Type II" preliminary agreements, by contrast, are "binding only to a certain degree," reflecting agreement "on certain major terms, but leav[ing] other terms open for further negotiation." Type II agreements "do[ ] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework."

*also Teachers Ins. & Annuity Ass'n of Am.* v. *Tribune Co.*, 670 F. Supp. 491, 498

(S.D.N.Y. 1997).

Here, specifically as to the Tuskegee Facility, the APA states:

> The parties acknowledge and agree that the affiliated nursing home facility located in Tuskegee, Alabama (the "Tuskegee Facility") is excluded from the transactions contemplated by this Agreement. Notwithstanding the foregoing, Seller will work together in good faith with the owner of the Tuskegee Facility in an effort to reach an agreement regarding the sale of the Tuskegee Facility to Purchaser on terms reasonably acceptable to such owner and Purchaser.

(APA § 18). The Court finds that the plain text of Section 18 of the APA creates

a "Type II preliminary agreement," *Brown*, 420 F.3d at 156, that binds Sellers

to negotiate in good faith about the sale of the Tuskegee Facility to Plaintiff.

As to the first factor, Section 18 clearly states Sellers' promise to "work

together in good faith with the owner of the Tuskegee Facility" in order to

pursue a possible sale to Plaintiff "on terms reasonably acceptable to" Plaintiff.

This language reveals an intent for both Sellers and Plaintiff to be bound to

negotiate reasonably acceptable terms for the sale of the Tuskegee Facility;

Sellers were additionally bound to act as facilitators in good faith negotiations

with the current owner of the Tuskegee Facility. Regarding the second factor,

the context of the negotiations, that parties have made no arguments about

relevant open issues that should weigh one way or the other. The Court

therefore considers the second factor to be neutral, although it notes that the

fact that the APA was amended 152 times suggests ongoing developments and

open issues that might encourage parties to adopt a more flexible preliminary agreement.

Turning to the third factor, while the agreement leaves open the precise terms of a potential Tuskegee sale, it does specify that such terms would have to be "reasonably acceptable to [Tuskegee's] owner and Purchaser," which limits open-endedness and supports a finding of a Type II agreement. The fourth factor cuts the other way: there is no indication in the record of any partial performance in negotiating the Tuskegee sale.

As to the fifth and final factor, there can be no doubt that an ultimate sale of the Tuskegee facility would have required a more formal agreement, and that the APA, more broadly construed, contemplates precisely such formal agreements for the sale of other facilities. Therefore, the document as a whole evidences the parties' contemplation of a formal sale agreement in the future, which weighs in favor of finding a binding Type II preliminary agreement. Because the first, third, and fifth factors support the finding of a binding agreement, while only the fourth factor suggests the opposite, the Court concludes that Section 18 of the APA creates a binding preliminary agreement.

Having resolved the parties' dispute as to whether Section 18 created a contractual obligation (*see* Pl. Opp. 24), or merely an unenforceable "agreement to agree" (*see* Def. Br. 18-19; Def. Opp. 13-14), and having found the former, the Court now considers whether Defendants breached their promise to negotiate in good faith for the sale of the Tuskegee facility to Plaintiff. The record shows that a receivership action was filed against the Tuskegee facility

on January 24, 2014. *See Bank of N.Y. Mellon Tr. Co., N.A., as Indenture Tr.* v. *Med. Clinic Bd. of Tuskegee, Ala., Salem Nursing & Rehab Ctr. of Tuskegee, Inc., and AltaCare Corp.*, No. 3:14 Civ. 00059 (WKW) (WC) (M.D. Ala. Jan. 24, 2014). The court in that action appointed a receiver for the Tuskegee facility on March 14, 2014. *Id.* at Dkt. #46. In addition, it is undisputed that "Tuskegee had its Medicare contract rescinded and the Medicaid was not reapplied for in 2013-2014." (Pl. 56.1 ¶ 69; Def. 56.1 Opp. ¶ 69). Mittleider testified that the Medicare contract was rescinded in early 2014, and that the Medicaid was not reapplied for in the end of 2013. (Mittleider Tr. 146-47). At a minimum, therefore, the Medicaid agreement was gone by the time the APA was executed on February 6, 2014.

The parties dispute whether Defendants informed Plaintiff about the loss of the Medicare or Medicaid agreements. (Pl. 56.1 ¶ 71; Def. 56.1 Opp. ¶ 71). In support of Plaintiff's position, Karniol avers that "Defendants failed to disclose to Trodale that the Medicare and Medicaid provide agreements for [the Tuskegee] facility were terminated." (Karniol Decl. ¶ 20). The deposition testimony on which Defendants rely to contest this assertion provides more ambiguous support for their claim. Defendants cite portions of Mittleider's testimony in which he first asserts that the Medicare and Medicaid agreements were terminated, next explains that the Medicaid was not reapplied for because "the building was going to be closed," and finally states that he "believe[s] that it was [disclosed to Plaintiff]." (Mittleider Tr. 146-47). Mittleider later clarifies that the "failure to reapply for a Medicare/Medicaid provider agreement ... [was

disclosed to Plaintiff] [a]s part of the discussion that led up to this verbiage [in Section 18].” (*Id.* at 147).

On this record alone, Plaintiff urges the Court to find that “Sellers did not work in good faith to arrange for the sale to plaintiff,” and, indeed, that Section 18 of the APA “was a fraud from its inception.” (Pl. Opp. 24). The Court cannot agree that the undisputed facts establish either that Sellers’ promise was undertaken in bad faith, or that Sellers failed to negotiate in good faith for the sale of the Tuskegee facility. Drawing all inferences in favor of Defendants, the non-moving parties, Mittleider’s testimony could support a finding that Defendants informed Plaintiff of the loss of the Medicare and Medicaid agreements. While the absence of Medicare and Medicaid agreements, and the existence of the receivership action, may have figured dramatically into the value of the facility, those facts would not necessarily have precluded Sellers from *negotiating* with the current owner of the facility in order to facilitate its sale to Plaintiff “on terms reasonably acceptable to such owner and Purchaser,” given the circumstances surrounding the property. Therefore, Plaintiff’s motion for summary judgment as to its claim that the Tuskegee provision of the APA was breached is denied.

### 3. The Court Grants Summary Judgment in Favor of Plaintiff on Defendants’ Counterclaim for Breach of Contract

Defendants have counterclaimed for breach of contract based on the undisputed fact that Plaintiff failed to close on the transactions contemplated in the APA. Their position is untenable: Defendants’ own breaches of warranties and failure to provide the requested financial statements were

31

material breaches that went "to the root of the contract" and precluded Plaintiff from closing on the transactions.  *See In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997) ("A breach in a contract which substantially defeats the purpose of that contract can be grounds for rescission.  The non-breaching party will be discharged from the further performance of its obligations under the contract when the breach goes to the root of the contract." (internal citation and quotation marks omitted)).  Plaintiff accordingly seeks summary judgment in its favor dismissing Defendants' counterclaim, and the Court grants that portion of Plaintiff's motion.

As an additional basis for dismissing Sellers' breach of contract counterclaim, the undisputed facts show that Defendants failed to comply with at least one condition precedent in the APA.  "A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co.* v. *Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995) (internal citations and quotation marks omitted).

Here, Section 5(a) the APA states:

> Purchaser's obligation to consummate the transactions contemplated in this Agreement and pay the Purchase Price and accept title to the Property shall be subject to the following conditions precedent on and as of the Closing Date or the waiver thereof by Purchaser, which waiver shall be binding upon Purchaser only to the extent made in writing on or prior to the Closing Date.

(APA § 5(a)).  The enumerated conditions precedent include: "that the representations and warranties of Seller set forth in this Agreement are true

and complete as of the Closing Date" (*id.* at § 5(a)(ii)(11)); that there be no filed

or threatened lawsuits, proceedings, or injunctions "that would adversely affect

the operation or financial condition of the Nursing Home Facilities [or] restrain

or prohibit the consummation of the transactions" (*id.* at § 5(a)(ii)vii)); and that

there be "no material and adverse change in the condition of the Purchased

Assets (or any portion thereof)" (*id.* at § 5(a)(ii)(viii)).

As detailed above, Defendants failed to comply with at least the

conditions precedent requiring that all of Sellers' representations and

warranties be true as of the Closing Date, and that there be no filed or

threatened lawsuits or other proceedings adversely affecting the Nursing Home

Facilities or restraining the contemplated transactions.  Defendants cannot

excuse these failures to comply by asserting that, "*Except as to the Reform

facility*, Sellers were fully prepared and able to satisfy each of the conditions

precedent and make the necessary transfer of clean title[.]"  (Def. Opp. 18

(emphasis added)).[11]  Even were that assertion true, Sellers' ability to comply

with the conditions precedent for *some* facilities does not excuse their failure to

do so for *all* facilities.  Plaintiff cannot be held liable for breach of contract for

declining to close on the contemplated transactions given Defendants' failures

to comply with the conditions precedent.[12]

---

[11]     Indeed, the argument reminds the Court of the old canard, "Other than that, Mrs.
Lincoln, how was the play?"

[12]     There were also changes in the condition of some of the Properties that may have been
material and adverse.  It is an undisputed fact that, following the execution of the APA,
the occupancy of The Cambridge House dropped to 80 of 130 licensed beds.  (Pl. 56.1
¶ 91; Def. 56.1 Opp. ¶ 91).  The parties contest whether this drop constituted "a
material adverse change."  (*Id.* at ¶ 92).  That dispute may not be resolved at the

Nor did Plaintiff's alleged failure to provide a notice of default prior to the expiration of the Due Diligence Period obligate Plaintiff to close on the transactions irrespective of Defendants' breaches and failures to comply with conditions precedent. To review, Section 4(a) of the APA provides that, if Plaintiff failed to give notice that it was not satisfied with the physical and financial condition of the Nursing Home Facilities by the expiration of the due diligence period, "it shall be conclusively presumed that Purchaser is satisfied with its due diligence review and this contingency shall be deemed satisfied, this contract shall continue in full force and effect." (APA § 4(a)). Defendants assert that Plaintiff failed to issue such a notice declaring the contract null and void prior to the expiration of the Due Diligence Period (Def. 56.1 ¶¶ 19-20), and argue that Plaintiff thus defaulted and should be forced to forfeit its deposit. Plaintiff disputes that it failed to provide timely notice of default. (Pl. 56.1 Opp. ¶¶ 19-20). The record shows that Plaintiff provided a notice of default on April 21, 2016. (Karniol Decl., Ex. 5). Whether or not the Due Diligence Period had expired by April 21, 2016, is therefore a disputed fact.[13]

---

summary judgment stage. The Court therefore bases its decision on Defendants' violation of other conditions precedent, which have been established by undisputed facts. Plaintiff asserts, incorrectly, that Defendants concede breaching provisions specific to Cambridge House by failing to respond to Plaintiff's arguments in its opening brief. (See Pl. Reply 1). That is simply not true. (See Def. Opp. 16 (arguing that the decreased census at The Cambridge House was neither a breach of warranty nor a failure of a condition precedent because Plaintiff was aware of and discussed the drop with Mittleider, and because such changes are inevitable)).

[13]  The Court observes that the one-hundred-and-fifty-second amendment to the APA appears to extend the general Due Diligence Period to 5:00 p.m. on April 12, 2016, and also states that the Due Diligence Period as to Bristol Healthcare Investors L.P. was "hard" as of the date of amendment, April 8, 2016. (Karniol Decl., Ex. 4 at 183).

However, that dispute does not preclude summary judgment on Plaintiff's motion to dismiss Sellers' breach of contract counterclaim because, even assuming that Defendants — the nonmoving parties — are correct about the facts, Plaintiff is entitled to judgment in its favor. Plaintiff's right to declare the contract null and void prior to the expiration of the Due Diligence Period entitled Plaintiff to terminate the agreement even *without* a breach by Sellers. In other words, that Plaintiff may have failed to exercise that right did not exhaust — or affect in any way — its rights to remedies from Defendants' breaches, or excuse Sellers' failures to comply with conditions precedent. Defendants' material breaches and uncured material failures to comply with one or more conditions precedent excused Plaintiff's failure to close the transactions, and require dismissal of the counterclaim. *See In re Lavigne*, 114 F.3d at 387.

Defendants throw in, without citation to the record, the assertion that delays caused by the many extensions to the APA prevented them from selling their properties to a third party. (Def. Br. 24). It is unclear whether this argument is part of Sellers' breach of contract counterclaim, or is a separate claim. In any event, Defendants have identified nothing in the record to support a finding that the extensions were anything other than valid, consensual modifications to the contract to which Sellers knowingly agreed. Defendants cannot now claim injury based on the express contractual terms to which they agreed. For all of these reasons, Defendants' counterclaim for breach of contract is dismissed.

**C.     Defendants' Motion for Summary Judgment Is Denied**

### 1.     Defendants' Motion for Summary Judgment Dismissing Plaintiff's Material Misrepresentations Claim Is Denied

The Court now turns to Defendants' motion for summary judgment, which begins with a request to dismiss Plaintiff's claims of material misrepresentations.  To establish a claim for fraud under New York law, a plaintiff must show "[i] a material misrepresentation or omission of fact [ii] made by a defendant with knowledge of its falsity [iii] and intent to defraud; [iv] reasonable reliance on the part of the plaintiff; and [v] resulting damage to the plaintiff."  *Crigger* v. *Fahnestock and Co., Inc.,* 443 F.3d 230, 234 (2d Cir. 2006).  "A plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth about an investment."  *Id.*  "Only when matters are held to be peculiarly within defendant's knowledge is it said that plaintiff may rely without prosecuting an investigation, as he had no independent means of ascertaining the truth."  *Id.* (internal alterations, citation, and quotation marks omitted).

Defendants argue for dismissal of Plaintiff's material misrepresentations claim on the basis that Plaintiff "cannot meet its burden with respect to the reliance factor."  (Def. Br. 20).  They assert that Plaintiff possessed actual knowledge of the material information it claims Defendants withheld, as well as the "means of discovering 'the truth.'"  (*Id.* at 20-21; *see also id.* at 19-22; Def. Opp. 6).  Plaintiff disputes these assertions, maintaining that Defendants had unique knowledge relevant to the contemplated transactions, including "the

financial condition of the assets, the ownership structure, and that Mr. Mittleider transferred the various APA assets from one entity he controlled to another." (Pl. Opp. 21-22). Plaintiff also argues that the numerous warranties it obtained from Defendants, combined with the funds it expended in anticipation of closing, and the making of its deposit funds inaccessible, are sufficient to establish reliance. (*Id.* at 22).

These disputes concern material facts, and they preclude the Court from resolving Plaintiff's material misrepresentations claim at the summary judgment stage of this case. Therefore, Defendants' motion for summary judgment dismissing this claim is denied.

### 2. Defendants' Motion for Summary Judgment Dismissing Plaintiff's Promissory Estoppel Claim Is Denied

Defendants fare no better with their request for the Court to dismiss Plaintiff's promissory estoppel claim. The elements of a promissory estoppel claim under New York law are: "[i] a clear and unambiguous promise; [ii] a reasonable and foreseeable reliance by the party to whom the promise is made; and [iii] an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp.* v. *Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995).

Defendants argue for dismissal of Plaintiff's promissory estoppel claim against Mittleider on the basis that Plaintiff cannot establish reasonable reliance. (Def. Br. 23). Defendants rest on their prior arguments as to reliance in discussion of the material misrepresentations claim, making no new assertions specific to promissory estoppel. (*Id.*). Conversely, Plaintiff advances

the same arguments about reliance for purposes of opposing dismissal of its promissory estoppel claim as it did for its material misrepresentation claim. (*See* Pl. Opp. 21-22). Once again, these disputes preclude the Court from dismissing Plaintiff's promissory estoppel claim on summary judgment.

### 3. Defendants' Motion for Summary Judgment Dismissing Plaintiff's Vendee Lien Claim Is Denied

As the Court explained in its prior opinion in this matter, "a vendee's lien is recognized in New York as an equitable remedy available to a purchaser of real property…. [that] attaches to property when a contract for sale of said property is executed, and the purchaser makes partial payment of the purchase price." *Trodale I*, 2017 WL 5905574, at *12 (internal citation and quotation marks omitted).

Defendants argue for dismissal of Plaintiff's vendee lien claim on the basis that Plaintiff has not identified to which property or properties the lien attaches, has paid the full purchase price for no properties, and has paid a deposit for none other than The Cambridge House. (Def. Br. 22). They cite no legal authority in support of their position. Plaintiff responds that it is law of the case that the cause of action is valid based on the Court's prior denial of Defendants' earlier motion to dismiss the claim. (Pl. Opp. 23).

The Court finds that Defendants have failed to establish, as a matter of law, that Plaintiff has no valid claim for a vendee lien. As the Court previously explained, "Plaintiff seeks a judgment that its payment of deposits for the nursing home properties entitles it to a vendee's lien in the amount of its deposits." *Trodale I*, 2017 WL 5905574, at *12. Once again, the Court will

permit this claim to proceed, and will deny Defendants' motion for summary

judgment.[14]

## D. The Court Cannot Determine on the Current Record the Damages Owed to Plaintiff

Both on its breach of warranty and breach of contract claims, Plaintiff

seeks damages, including costs, attorneys' fees, and interest, as well as return

of its deposit. (Pl. Br. 18-21). Here, Plaintiff relies on Sections 11(b) and 12 of

the APA. Section 11(b) states:

> Seller agrees to indemnify, save, protect, defend and hold harmless Purchaser and its respective employees, affiliates, managers, members, officers, directors and agents, from and against all Losses arising from, out of, or relating to … any material inaccuracy or material breach of any representation, warranty, covenant, agreement or obligation contained in this Agreement or in any of the Other Documents. Seller further agrees to pay any reasonable attorneys' fees and expenses of Purchaser arising from any indemnification obligation hereunder.

(APA § 11(b)). Section 12 states:

> If prior to the Closing, Seller shall default under any covenant, obligation or closing condition or materially breach any representation or warranty set forth herein (which default is not waived in writing by Purchaser) and such failure is not cured within ten (10) days after written notice thereof to Seller … then Purchaser may elect to (A) terminate this Agreement by written notice to Seller, in which event (1) the Title Company shall refund the Deposit plus any accrued interest to the

---

[14] Plaintiff attempts to slip into its opposition brief a motion for summary judgment in its favor on the vendee lien claim. (*See* Pl. Opp. 23 ("Thus, since there is no dispute that the Deposits [were] payment[s] towards the purchase price, this claim is easily sustained. In fact, if anything, the Court should search the record and grant summary judgment in Trodale's favor on this claim.")). As Plaintiff's opening brief did not make this argument or move for summary judgment on this claim, the Court will not address it.

> Purchaser and (2) the Seller shall pay an amount equal
> to its reasonable out-of-pocket costs in connection with
> pursuing the transaction contemplated by this
> Agreement (including without limitation, reasonable
> attorneys' fees and related costs)[.]

(APA § 12(a)).  Having granted partial summary judgment in Plaintiff's favor on its breach of warranty and breach of contract claims, the Court now agrees that the plain language of APA Sections 11(b) and 12 entitles Plaintiff to damages, including costs, fees, and interest, as well as the return of part or all of its deposit.

The Court is not persuaded by Defendants' arguments to the contrary. Defendants fall back on their general waiver argument, contending that Plaintiff waived any right to indemnification by acquiring actual knowledge "about the Reform litigation, the lack of audited financials, the census change at The Cambridge House, the judgments against the old operators, and the *qui tam* action before signing the amendments to the APA[.]"  (Def. Opp. 19-20). And they insist that Plaintiff is not entitled to recover costs incurred after it acquired knowledge of the information and events it claims breached Defendants' warranties.  (*Id.* at 21).  Defendants further argue, without citation to the record or to legal authority, that "[a]ny right to have the title company refund the escrow deposit was tied to a notice to terminate the APA, which [Plaintiff] chose to never give."  (*Id.* at 20).

The Court has already rejected the notion that, to the extent Plaintiff acquired such knowledge, it waived its rights under the APA.  Moreover, Defendants' arguments do nothing to address their breach of contract by

failure to deliver the audited financial reports. While the plain language of Section 12 does require written notice from Plaintiff that it is terminating the agreement in order to trigger the deposit refund, Plaintiff provided that notice on April 21, 2016. (Karniol Decl., Ex. 4).

As it happens, the record currently before the Court is insufficient to determine the precise amount of damages to which Plaintiff is entitled on the claims that have been resolved in its favor. To start, the parties dispute whether Plaintiff is entitled to the entirety of the deposit funds remaining in escrow. (*See* Pl. 56.1 ¶¶ 8-11; Def. 56.1 Opp. ¶¶ 8-11). Plaintiff also claims certain expenses as to which Defendants state they have no basis to admit or deny, including a $30,000.00 deposit to a private bank in connection with the anticipated closing on The Cambridge House; $432,897.60 in attorneys' fees in connection with The Cambridge House transaction; and $8,032.72 attorneys' fees in connection with a different but related litigation occurring in Virginia. (Pl. 56.1 ¶¶ 112-16; Def. 56.1 Opp. ¶¶ 112-16). Finally, Plaintiff seeks attorneys' fees in the present action, which cannot be quantified while claims remain open. (Pl. 56.1 ¶ 117). The Court therefore declines to determine the amount of damages without further inquiry, and will order a hearing on damages once all claims have been resolved.

## CONCLUSION

For the reasons stated in this Opinion, Plaintiff's motion for partial summary judgment is GRANTED in part and DENIED in part. Defendants' motion for summary judgment is DENIED in full. The parties are hereby

41

ORDERED to file a joint letter on or before **May 3, 2019**, advising the Court of the parties' availability for trial in the second half of 2019.

The Clerk of Court is directed to terminate the motions at docket entries 107 and 109.

SO ORDERED.

Dated:    March 21, 2019
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge